**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

<u>IN THE MATTER OF THE SEARCH
OF:</u>

67 BIG CREEK ROAD
MIDVILLE, GEORGIA 30441

<u>FILED UNDER SEAL</u>

<u>Case No.</u> **4:20mj54-CLR**

**<u>AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE</u>**

I, Douglas Bridges, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the search of

the residential property and any outbuildings and vehicles located on the property,

of 67 Big Creek Road, Midville Georgia 30441 (herein after "Subject Location"),

described in Attachment A, for the items described in Attachment B.

**INTRODUCTION AND AGENT BACKGROUND**

2.     I am a Special Agent with the United States Department of

Agriculture Office of Inspector General ("USDA-OIG"). As such, I am an

"investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7)

in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.     I have been employed with USDA-OIG since September 2010. I attended the Criminal Investigators Training Program and the Immigration and Customs Enforcement ("ICE") Special Agent Training Program ("SATP") at the Federal Law Enforcement Training Center from January 2010 until June 2010. I have been employed in various law enforcement positions in local, state, and federal agencies since April 2000. I have applied for or participated in numerous search warrants during my career.

4.     As a USDA-OIG Special Agent, my duties include investigating alleged violations of laws enforced by USDA, including cases involving illegal animal fighting. Since I have been in law enforcement, I have participated in numerous investigations involving criminal activities including but not limited to illegal animal fighting, and I have received specialized training in the investigation of animal fighting and related Title 18 offenses. My prior experience in this area has included the use of confidential informants, undercover officers, and electronic surveillance. I have participated in many aspects of criminal investigations, including conducting surveillance and issuing subpoenas. I have debriefed or participated in the debriefings of numerous defendants, informants, and witnesses.

5.     Through training and investigations of persons arrested for animal fighting offenses, I am familiar with the actions, traits, habits, and terminology

utilized by handlers or owners of roosters and dogs involved in animal fighting ventures. I have also participated in investigations of suspected animal fighters.

6.    I am familiar with the facts set forth herein based on my personal observations and information provided to me by other law enforcement officers participating in this investigation. I am also familiar with the facts set forth herein based on my review of documents, reports, and photographs pertaining to this and other investigations.

7.    As the purpose of this affidavit is only to establish probable cause to support the requested search warrant, I have not set forth each and every fact known concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part. In addition, the events described in this affidavit occurred on or about the dates provided herein.

8.    Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that animal fighting, including conspiracy to possess, train, transport, purchase, sell, receive, and deliver fighting roosters for participation in an animal fighting venture occurred and is continuing to occur at the Subject Location, in violation of Title 7 U.S.C. § 2156 and Title 18 U.S.C. § 371.  Further, there is probable cause to believe that an illegal gambling business is in operation at the Subject Location in violation of Title 18 U.S.C. 1955(a).  Title 18 U.S.C. § 1955(a) prohibits conducting, financing, managing, supervising, directing, or owning all or part of an illegal gambling business. An illegal gambling business means a gambling business which: (b)(1)(i) is a violation

3

of the law of a State or political subdivision in which it is conducted, (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business, and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.   I believe there is probable cause to believe that evidence, instrumentalities, and fruits of such violations, as described in Attachment B, will likely be found on the Subject Property more specifically described in Attachment A.

## BACKGROUND ON ANIMAL FIGHTING VENTURES

9.      The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in, or cause an individual who has not attained the age of 16 to attend, an animal fighting venture. 7 U.S.C. § 2156(a). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b). It is also unlawful to use an instrumentality of interstate commerce for commercial speech for purposes of advertising an animal for use in an animal fighting venture, or for promoting or furthering an animal fighting venture. 7 U.S.C. § 2156(c). It is also unlawful to attend an animal fighting venture.  7 U.S.C. 2156(a)(2)(A).

10.    All of these offenses are felonies punishable by up to five years in prison, except for a violation of 7 U.S.C. 2156(a)(2)(A), which is a misdemeanor punishable up to one year. 7 U.S.C. § 2156(i); 18 U.S.C. § 49.

11.    The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that "[t]he Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section." 7 U.S.C. § 2156(e).

12.    The Animal Welfare Act states that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e). Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id.*; 28 U.S.C. § 2461.

13.    The remaining paragraphs in this section are based on my training and experience and information provided by other law enforcement officers who are experienced in investigating animal fighting ventures.

14.    Cock fighters often participate in cockfighting "derbies," where large numbers of cock fighters will pit their roosters against one another for the entertainment of others and to enrich themselves. Cock fighting spectators gamble on the outcomes of the cock fights, and the owners of the animals stand to gain

5

financially either through their own wagers, through an arrangement with the host of the cock fight, or through the enhanced value of their winning gamecocks.

15.     Typical cock fights employ the use of weapons that are attached to the backs of the birds' legs. Roosters have a natural bony spur on the back of each leg. This spur is used by the rooster to cause injury to other animals when it kicks with its leg. This is the rooster's primary means of inflicting injury. Cock fighters shave the bird's natural spur down to a small point, and then supplement the bird's fighting ability by attaching a gaffe or knife to the bird's leg. The gaffe is a long curved spear, while the knives are pointed blades of various lengths sharpened on one or both sides. These metal implements are attached to a small, soft leather collar that has a hole in it. This collar, and the attached weapon, is wrapped around the bird's ankle and fit by means of the collar's hole over the shaved down spur of the bird. These weapons are also called gaffs, long heels, short heels, jaggers, bayonets, Texas Twisters, socket knives, long knives, short knives, slashers, and postizas in other parts of the country and world.

16.     Due to the enhanced stabbing and slashing ability bestowed upon the birds by the man-made weapons, cock fighting is an extremely painful, bloody, and deadly event. Birds are stabbed, slashed open, eviscerated, and partially decapitated. Birds that lose a match most often die. It is not uncommon for winning birds to die shortly after a fight or be unable to continue in the derby because of mortal wounds.

17.     Cock fighters take pride in their gamecocks and breed them as others might breed non-fighting animals. Cock fighters select their animals for the traits they value – size, toughness, and aggression – and may enhance the performance of the animals using veterinary drugs. Cock fighters then train their gamecocks to fight, often to the death.

18.     Owners/operators of cock fighting arenas, called "pits," hold organized fights where many people can fight their trained birds against the fighting birds of other people. These arenas, depending on the level of sophistication, will have a central pit in which to host main fights and "drag pits" to accommodate fights from the central pit that have lasted too long and lost the interest of the spectators. These arenas will often have permanent stadium-style seating, electricity, plumbing, concessions, and ample parking for participants and spectators.

19.     Owners often have schedules professionally printed that show the dates of the fights that people can enter, spectate and wager upon. Owners distribute these schedules by various means, including by text message, to enhance participation and attendance at their organized fights.

20.     Owners charge everyone a set fee for entrance onto the property. This is an entrance fee and is usually $25 to $50. Individuals that bring birds must pay a fee based on the amount of birds being fought in the derby. For example, a 7-bird derby may have a fee of $2,000. In this example, a person must enter 7 birds and pay $2,000 towards the "pot." The winner of the derby is the person whose birds have the best overall win/loss record; this person wins the "pot." If multiple people

7

tie with the best win/loss record then the pot is split between them At well attended events, the "pot" can be well over $100,000. In addition to the entry fee and the fee paid by the exhibitor of the bird, individuals place multiple bets throughout the day based on which bird they believe may win each individual fight.

21.     Owners enrich themselves by keeping the entry fee and a percentage of the pot, charging participants for extra "options" or "insurance" (which may increase a participant's chance of winning more money), charging spectators to park at the pit, selling food and drinks at the event, selling gaffes and other bird fighting supplies, charging vendors to set up booths at the pit, charging premiums for preferred seating, charging annual rentals of VIP rooms at the pit location, and charging annual fees for bird keeps at the pit location. A keep is a wooden hut with multiple compartments to house and segregate a contestant's fighting birds while they attend the event.

## **PROBABLE CAUSE**

22.     On or about June 2018, the South Carolina Department of Public Safety (SC DPS) Immigration Enforcement Unit (IEU) began an investigation of individuals involved in various criminal activities, including cockfighting, throughout South Carolina. The SC DPS IEU requested assistance from other law enforcement agencies, including the USDA OIG.

23.     In December 2019, a Confidential Human Source (CHS) received an invitation to attend a cockfight at the Subject Location. The Subject Location is

located in Emanuel County, in the Southern District of Georgia. Public records indicate the property is owned by William Shannon SCOTT.

24.    The CHS had provided reliable and credible information to SCDPS on numerous occasions since approximately January 2018.   Unfortunately, as of the date of this search warrant application, the CHS is no longer alive.

25.    On January 19, 2020, the CHS attended the cockfight while utilizing a concealed audio and video recording device.   The CHS was able to obtain video footage of the cockfight, which included the still images below:





26.     Prior to being granted entry to the cockfight, the CHS was required to pay for membership into the Georgia Gamefowl Breeders Association (GGBA) at a manned entry gate and was issued a membership card and a parking pass. To create the membership card and parking pass, the gate attendant took the CHS's state identification card and returned later with the CHS's identification, a printed and laminated membership card displaying the name of the CHS and signed by an issuing authority, and a printed and laminated parking pass.

10







27.    During the January 19, 2020 derby, the CHS learned there were fights scheduled every two weeks at 67 Big Creek Road for the remainder of the cockfighting season, ending July 18, 2020.

11

28.     The team that brought the CHS to the derby paid an entry fee for its fighting birds and had an opportunity to rent an enclosed trailer or camper type enclosure to house the birds in until their fights began.

29.     The CHS described the derby being held inside a large building (hereinafter, the "BARN") behind a house, at the back of a large piece of property. In an overhead photograph of the Subject Location, the BARN is visible approximately 1000 feet northwest of what appears to be the main residence of the property facing Big Creek Road.

30.     The BARN housed a main cockfighting pit with stadium seating surrounding it where people placed bets on which bird would win the matches. The CHS described an office area and a concession stand where people ordered food which was made to order. The CHS described surveillance cameras installed around the pit and television monitors in various places displaying the fights.

31.     On March 2, 2020, agents conducted a flyover of the Subject Location to verify that the provided schedule was accurate. Agents estimated there to be around 200 vehicles that could be seen on the property.

32.     On May 22, 2020, agents installed a concealed camera on the public right-of-way adjacent to the entrance of the Subject Location. This camera was able to capture images of vehicles as they entered and exited the property on May 23, 2020, the day of a scheduled cockfight.

33.     Using the photos, agents were able to identify approximately 100 vehicles entering and exiting the property. The vehicle tags were from Georgia, South Carolina, North Carolina, Florida, Alabama, and Kentucky.

34.     On June 5, 2020, agents again installed cameras on the right-of-way to capture images of vehicles entering and exiting the Subject Location. Agents were able to capture images of vehicles from Georgia, Florida, South Carolina, North Carolina, New Jersey, and New York entering the property.

35.     On June 6, 2020, two undercover agents (UCA) were equipped with audio and video recording devices to attend the cockfight scheduled for that day. The UCAs observed and recorded a cockfight, as shown in the following screen capture.



36.     The UCAs were required to pay $25 each to enter the Subject Location at a temporary gate, which was comprised of a chain blocking further entry onto the property. The UCAs attempted to obtain a membership to the GGBA. The agents paid the $100 membership fee but were later told that the person who makes the membership cards was not available. The UCAs were told they could get a membership at the next cockfight, which is scheduled for June 20, 2020.

37.     While at the cockfight, the UCAs noticed that the property has several outbuildings that are available for individuals to rent for the day to house their fighting birds. The outbuildings appeared to be old pull-behind camper trailers and enclosed box trailers equipped with air conditioning units.

38.     The UCAs also noticed that there is a concession stand that has someone cooking food all day long. The UCAs were able to purchase meals and drinks to eat.

39.     The UCAs also noticed that there is a large barn on the property (the same BARN previously mentioned). Inside the BARN, there are three large pits which are where the birds are fought. Situated around the pits is stadium style seating that allows spectators to sit and see the pits over the heads of the persons sitting in front of them.   The UCAs confirmed the CHS's previous reports of surveillance cameras installed around the pit and television monitors in various places displaying the fights.

40.     The UCAs noted that there were approximately 61 teams that entered their roosters to fight in the June 6, 2020 derby. Each team was required to enter 7

birds and pay $2,000 as its entry fee. Each team was competing for a chance to win $120,000.

41.     The UCAs were able to view individuals as they weighed the birds and affixed numbers on the birds. The UCAs were later able to observe several cockfights. They noticed that the cockfights were not timed and the fights did not end until one or more of the birds was dead.

42.     The UCAs were able to observe a large blue barrel stationed just outside the entrance to the barn. This barrel was where contestants disposed of their dead birds when a fight was finished.

43.     The UCAs noticed that there were individuals that had tables set up and were selling knives, gaffes, t-shirts, and hats. One individual had a table set up and was charging individuals to sharpen the knives and gaffes used by their fighting birds.

44.     During their time at the fight, the UCAs were invited to attend a cockfight that is scheduled to be held on June 13, 2020 in Twin City, Georgia. The UCAs were also invited to attend a cockfight that is scheduled to be held on June 20, 2020 at the Subject Location.

45.     Agents conducting surveillance and the concealed right-of-way cameras established that individuals began arriving at the Subject Property at approximately 5:15am on June 6, 2020, and the last person left the property at approximately 9:30pm that evening.

46.     The UCAs had a conversation with William Shannon SCOTT inside the derby location during their attendance at the derby on June 6, 2020. SCOTT was standing in front of the office inside the BARN.  The conversation was video and audio recorded, and SCOTT was identified based on a comparison of his driver's license photograph and photographs on social media accounts.

47.     It was noted by both UCAs and the CHS that admittance to the 67 Big Creek Road derby is controlled by people collecting fees to enter at the gate, which is a length of chain stretched across the dirt road portion of the property's circular drive.  The gate, which appears to only be up on cockfighting event days, is located behind the main residence, approximately 200 feet to its west.

48.     The UCAs observed that vehicles and their passengers are not allowed to enter past the controlled gate unless attending the cockfighting event. Attendees who arrived late parked their vehicles outside the gate, but still on the premises.

49.     Vehicles, often with attached trailers containing cages, are used to transport animals and supplies to be used in an animal fighting venture. Therefore, on the day of a scheduled cockfighting event at the Subject Location, there is probable cause to believe that any vehicle present on the grounds of the Subject Location will contain evidence of illegal animal fighting such as parking passes, gaffes and knives, medical supplies, animal cages, and game fowl.

50.     On the day of a cockfighting event at the Subject Location, there is also probable cause to believe that any person voluntarily on the premises beyond the gate is attending an animal fighting venture in violation of 7 U.S.C. 2156(a)(2)(A).

16

Given the entry requirements for the derbies held at the Subject Location, there is probable cause to believe all persons present will be in possession of a GGBA membership card and an event parking pass.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

50.    This application seeks permission to search for records that might be found at the Subject Location, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.    <u>Probable cause</u>.  I submit that if a computer or storage medium is found at the Subject Location, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

17

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      Based on the CHS and UCA reports of creation of membership cards and parking passes as well as photographs of the same, I am aware that computer equipment is used to generate, store, and print documents used in the cockfighting and gambling scheme.  There is reason to believe that there is a computer system currently located at the Subject Location.

18

52.   <u>Forensic evidence</u>.   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the Subject Location because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under

investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical

location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are

necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.    Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data

22

recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

55.    Because several people share the Subject Location as a residence, it is possible that the Subject Location will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

56.    I am aware that William Shannon SCOTT, owner and resident of the Subject Location, operates Triple (S) Steel Erectors, LLC, ("the Company"), which is a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate

business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## AUTHORIZATION REQUEST

51.     This affidavit is made in support of a warrant to search the Subject Location as described in Attachment A, for the items further described in Attachment B.

52.     By this affidavit and application, I request that the Court issue a search warrant permitting federal agents to search the residence, exterior property, vehicles, utility trailers, sheds and all outbuildings of premises described in Attachment A, and all persons on the premises engaging in or attending an animal fighting venture as described in Attachment A, and seize evidence as specified in Attachment B.

53.     Permission is sought to allow the government to obtain the assistance

of Federal, State or local law enforcement authorities, and an animal rescue group or contractor identified by the U. S. Marshal's Service to handle and provide necessary care to any animals seized, in executing the search of the Subject Location described in Attachment A.

54.   Permission is also sought to allow these parties to seize items identified in Attachment B as well as to take photographs or video of any location, item, or individual at the search site, use water and electrical power at search site, to set up necessary equipment, and to establish safety perimeters as government agents deem necessary to accomplish the search.

55.   The government also seeks permission to allow animal technicians to enter the property to assist with handling of animals once the premises are secure and the search has been completed, who will then take physical custody of the seized animals.

56.   "Necessary care including veterinary treatment shall be provided" to any animal seized, as required by the Animal Welfare Act. 7 U.S.C. § 2156(f).

57.   To ensure the safety of the executing agent(s) and to avoid premature disclosure of the investigation, it is requested that the agents be permitted to execute the warrant during both daytime and nighttime hours as deemed appropriate by the executing agent(s) to maximize concealment. It may be necessary for members of the search team to enter the Subject Location prior to 6:00 am on the day of the search to conduct surveillance and establish a tactical position.

## SEALING REQUEST

58.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.

59.     Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

60.     I submit that this affidavit supports probable cause for a search warrant authorizing the search of the Subject Location described in Attachment A, to seek the items described in Attachment B.


                          s/ Douglas Bridges
                          Douglas Bridges
                          Special Agent
                          U.S. Department of Agriculture
                          Office of Inspector General


Attested to via telephone this 16th day of June, 2020.

                          Christopher L. Ray
                          United States Magistrate Judge
                          Southern District of Georgia